NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   CC-13-1019-KiPaD |
| HASSEN IMPORTS PARTNERSHIP, | Bk. No.   2:11-42068 |
| Debtor. | |
| HASSEN IMPORTS PARTNERSHIP; LOS ANGELES COUNTY TREASURER AND TAX COLLECTOR, | |
| Appellants, | |
| v. | **M E M O R A N D U M**[1] |
| CITY OF WEST COVINA; CITY OF WEST COVINA, as successor to the CITY OF WEST COVINA COMMUNITY DEVELOPMENT COMMISSION; COREPOINTE CAPITAL FINANCE, LLC; COREPOINTE INSURANCE CORPORATION, | |
| Appellees. | |

Argued and Submitted on June 20, 2013,
at Pasadena, California

Filed - August 19, 2013

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Ernest M. Robles, Bankruptcy Judge, Presiding

Appearances:     Theodore B. Stolman, Esq. of Stutman, Treister & Glatt PC argued for appellant, Hassen Imports Partnership; Stephen Thomas Owens, Esq. of Squire Sanders (US) LLP argued for appellees, City of West Covina and City of West Covina as successor to the City of West Covina Community Development Commission.

---

    [1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Before: KIRSCHER, PAPPAS and DUNN, Bankruptcy Judges.

Appellants, debtor Hassen Imports Partnership ("Debtor") and the Los Angeles County Treasurer and Tax Collector ("LA County"), appeal an order from the bankruptcy court granting the motion of appellees (collectively, "City"), to convert Debtor's case from chapter 11 to chapter 7 for "cause" under 11 U.S.C. § 1112(b)(4)(A).[2]  Debtor also appeals the bankruptcy court's order denying its motion for reconsideration of the conversion order.  We AFFIRM.[3]

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Background prior to Debtor's bankruptcy filing

Debtor, a California limited partnership, filed a chapter 11 bankruptcy case on July 27, 2011.  Debtor consists of Hassen Imports, Inc., as the general partner, and Dighton America, Inc. ("Dighton"), as the sole limited partner.  Debtor is engaged in the business of commercial real estate development, owning several parcels of real property in the cities of Covina and West Covina, California. Debtor's largest secured creditors are CorePointe, LA County and the City.

The most valuable and lucrative of Debtor's properties have

---

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[3] Per our Conditional Order of Waiver entered on April 1, 2013, appellees CorePointe Capital Finance, LLC and CorePointe Insurance Corporation (collectively, "CorePointe") waived their rights to appear at oral argument by not filing a timely brief on appeal.

been improved to accommodate major car dealerships and are leased to either West Covina Motors, Inc. ("WCM") or West Covina Ford, Inc. ("WCF"), which collectively own and operate Clippinger Ford, Clippinger Chevrolet, and Clippinger Chrysler Jeep Dodge. Both WCM and WCF are related to Debtor in that WCM and WCF are wholly owned by West Covina Automotive Holding, Inc., which is owned by Ziad Alhassen ("Alhassen"). Alhassen is also the president of Hassen Imports, Inc., general partner of the Debtor.

Debtor's car dealership properties, which are located in West Covina, include: (1) the Chevrolet Dealership Property; (2) the Ford Dealership Property; (3) the property with improvements for a defunct Hummer dealership ("Hummer Property"); (4) the Dodge/ Chrysler Dealership Property; and (5) a property with improvements for a defunct Mazda dealership ("Mazda Property").[4] Collectively, these five properties are referred to as the "Dealership Properties," and the related dealerships are referred to as the "Dealership Franchises."[5] Some of these properties have been owned by Debtor and operated as car dealerships by Alhassen since 1983.

Besides the Dealership Properties, Debtor owns several other parcels of real property in the City of Covina, which are

---

[4] Shortly after Debtor filed bankruptcy, the City filed an adversary proceeding for fraudulent conveyance to recover the Mazda Property, which Debtor had conveyed to another party in 2009. The parties ultimately agreed that the Mazda Property would be returned to the estate.

[5] Debtor owns only the real property and improvements for the Dealership Properties and does not own any of the inventory or equipment situated thereon; such personal property is owned by the dealerships.

-3-

generally held for development purposes (together with the Dealership Properties, the "Properties").

In exchange for certain loans, Debtor executed several promissory notes in favor of Chrysler Financial Services Americas LLC, dating from July 1999 through October 2006, in the aggregate principal amount of $26.2 million.  CorePointe is the current beneficiary of the Chrysler notes and is Debtor's largest secured creditor, holding senior deeds of trust on at least eight of the Properties, securing an obligation of approximately $30 million, including Debtor's guarantee of about $2.4 million in wholesale motor vehicle financing (known as "floorplan loans") to WCM and WCF.[6]  CorePointe also holds a first-priority security interest in virtually all assets of WCM and WCF to secure the floorplan loans to those entities.

In 1999, the City agreed to lend Debtor and WCM $4.1 million in exchange for guaranties that the City would receive certain levels of sales and property tax proceeds from the operation of certain dealerships located on some of the Dealership Properties owned by Debtor.  The obligations were secured by junior deeds of trust (behind CorePointe's) on the Chevrolet Dealership Property, the Ford Dealership Property and certain real property owned by Alhassen.

Debtor's relationship with the City eventually deteriorated, and in 2006 the City sued Debtor, WCM and certain guarantors under the loan agreement in state court.  After five years of litigation, the state court found Debtor and WCM liable and

---

[6] CorePointe filed a proof of claim for $29,473,732.

-4-

entered a judgment in favor of the City for $3.93 million, which was later amended to include attorney's fees, for a total judgment of $7.58 million.[7] The state court further ordered the judicial foreclosure of the Chevrolet Dealership Property, the Ford Dealership Property, and certain real property owned by Alhassen. A receiver was appointed for Debtor on July 26, 2011, thus prompting the bankruptcy filing on July 27. Debtor and WCM have appealed the state court judgment, but the outcome of that appeal is unknown.

## B. The City's motion to convert and other related events

After losing a determination that Debtor was a single asset real estate case, the City filed its motion to convert Debtor's case to chapter 7 or, alternatively, appoint a trustee on February 8, 2012 ("Motion to Convert"). The City alleged that "cause" existed to convert the case to chapter 7 under § 1112(b)(4)(A) because Debtor was suffering substantial and continuing losses to and diminution of its estate and had no reasonable likelihood of rehabilitation.[8] Among other things, the City argued: (1) Debtor had not collected approximately $5 million in unpaid rent from the car dealerships controlled by Alhassen; (2) Debtor had not paid the taxes due on certain Properties going

---

[7] The City filed a proof of claim for $11,445,502.63, which included interest on the state court judgment and a claim for additional sales tax revenues that the City asserts it is owed, which Debtor disputes.

[8] The City also moved to convert the case for gross mismanagement under § 1112(b)(4)(B), but the bankruptcy court ultimately determined that the City had failed to show cause under that statute. The City has not cross-appealed that determination. Therefore, we do not discuss it.

-5-

back to the 2008-2009 tax year, totaling nearly $1.5 million; (3) Debtor had not paid the interest and penalties accruing postpetition on the delinquent real estate taxes due on eight of its Properties, paying such obligations only on the Chevrolet and Ford Dealership Properties; (4) Debtor was unable to pay the administrative claim for its attorney's fees and costs; (5) Debtor had failed to seek other tenants or uses for those Properties which were under-utilized or vacant; (6) Debtor's monthly operating reports ("MORs") from July 2011 through December 2011 showed losses of approximately $80,000 per month; and (7) Debtor had failed to submit a proposed plan of reorganization after six months of being in chapter 11.

The original hearing date for the Motion to Convert of February 29, 2012, was continued no less than ten times based on either the City's motions (which Debtor opposed) or the parties' joint stipulations. It was eventually heard on December 5, 2012.

Over the course of eleven months, numerous pleadings were filed in support of, and in opposition to, the Motion to Convert. Debtor filed its first opposition to the Motion to Convert on March 6, 2012, contending that the City had failed to demonstrate "cause." Debtor asserted that Alhassen had recently negotiated the sale of the Dealership Franchises to an unrelated third party for over $10 million, of which $7 million in proceeds would benefit the estate ("Sale Transaction"). Debtor argued that the Sale Transaction, which included leasing five of the Dealership Properties to fund future plan payments, would benefit Debtor's creditors by: (1) paying just over $1 million of its delinquent real estate taxes; (2) paying $572,000 towards past due real

-6-

estate taxes owed on the Chevrolet and Ford Dealership Properties — the two properties on which the City had liens; (3) and paying CorePointe at least $6 million towards its outstanding secured claims. In other words, WCM and WCF were giving Debtor $6 million of their sale proceeds to pay towards Debtor's secured debts. Debtor asserted that the purchaser had agreed to enter into new, long-term leases on the Dealership Properties at lease rates that were materially higher than the rent currently being collected from the dealerships, which would provide a beneficial income stream for at least ten years.

Debtor further asserted that it was current on its monthly adequate protection payments to CorePointe of $121,500, which had just been increased to $135,000. According to Debtor, CorePointe had agreed that Debtor did not, at that time, need to pay the penalties and interest accruing on the delinquent taxes on the other six Properties on which CorePointe had liens (but the City did not), because CorePointe was not concerned that its collateral was in jeopardy.

Debtor admitted that it had not been collecting outstanding rents on the Dealership Properties, and part of the problem of reconciling its books with WCM and WCF was because those entities' books were kept on an accrual basis, while Debtor's books were kept on a cash basis. In any event, Debtor's forensic accountant, Alan Levy ("Levy"), determined that Debtor was owed $2.87 million in outstanding rent from the Dealership Franchises from January 2007 through July 2011 and that, overall, Debtor was owed about $8 million from the Dealership Franchises, inclusive of the $2.87 million in rent. As for filing a plan, Debtor argued that

-7-

it still had six weeks before the exclusivity period ended, which was not a basis for converting its case. Finally, Debtor disputed the alleged monthly operating losses of $80,000 as "overstated," because the City had failed to consider that the MORs were reported on an accrual, not cash, basis; two-thirds of Debtor's operating expenses were attributable to the accrual of depreciation and loan interest on the Properties, and the other third, the accrual of real property taxes, would be paid in full by the Sale Transaction.

Debtor filed a supplemental opposition to the Motion to Convert, along with its proposed plan of reorganization, on April 23, 2012. Debtor contended that the Sale Transaction (or a similar sale), which was the lynchpin of the plan, would pay all claims in full. Debtor further contended that it had made all of its postpetition payments to CorePointe, paid its current postpetition property taxes, collected all postpetition rents from its affiliates, worked with accountant Levy to determine its intercompany claims and other accounting matters, was current in paying its U.S. Trustee fees, and had timely filed all of its MORs. As for the pending Sale Transaction, which Debtor argued would benefit the estate with an estimated $8.2 million in proceeds and fund the plan, the following tasks had to be completed for it to close: (1) the auto manufacturers --- Ford, General Motors, Chrysler and Mazda --- had to approve the buyer to operate the Dealership Franchises, which Debtor anticipated would be successful and done in a timely manner; and (2) by agreement, the City had to approve the buyer as a lessee and operator of the dealerships at the sites. Debtor believed the Sale Transaction

-8-

could be consummated by July 30, 2012. Accordingly, argued Debtor, the City had failed to establish cause for conversion.[9]

While the Debtor and the City attempted to resolve their disputes, Debtor filed its Third Amended Chapter 11 Plan ("Plan") and Disclosure Statement on August 8, 2012. Debtor conceded that the Plan's success depended upon the pending Sale Transaction to buyer YTransport LLC ("YTransport"), which involved the sale of assets not owned by Debtor but rather Debtor's affiliates, WMC and WCF. The Third Amended Disclosure Statement was approved on August 20, 2012, and the confirmation hearing was scheduled for October 25, 2012.

On September 6, 2012, the City filed a supplemental declaration in support of its Motion to Convert. Although the parties had reached a settlement in principle of their disputes and treatment of the City's claim on August 9, 2012, recent events had caused the City to renew its motion: (1) CorePointe had withdrawn its support for the Sale Transaction because, even though Debtor made the July adequate protection payment, Debtor had not made the August payment, and the default rate of interest on future CorePointe payments was 4% higher than the non-default rate, which the City argued eroded its junior lien position; (2) Debtor had failed to make timely court-ordered payments of

---

[9] While the Motion to Convert was pending, Debtor moved for approval of a third stipulation for its adequate protection payments to CorePointe for the time period of June 2012 through October 2012. Debtor was to pay CorePointe $135,500 for the month of June, and $145,500 for the months of July through October. Debtor conceded that it had failed to make the July 2012 payment, for which CorePointe filed a notice of default, but stated that it would make that payment by August 9. The third stipulation was approved on June 20, 2012.

-9-

interest and penalties due on the delinquent real estate taxes owing on the Chevrolet and Ford Dealership Properties, which caused these amounts to accrue and further erode the City's junior lien position; (3) Debtor had retained counsel without court approval to litigate against the City of Covina in a pending eminent domain action, which resulted in an attorney's lien filed against Debtor's assets; and (4) the Mazda Dealership franchise had been terminated by Mazda Motors, which threatened consummation of the Sale Transaction because that franchise was a key element of the sale.

In response to the City's supplemental declaration, Debtor contended: (1) CorePointe was onboard with the Sale Transaction, and the parties were resolving the outstanding August adequate protection payment and the issue of whether Debtor would be charged the default rate of interest; (2) it had made all of the payments for interest and penalties accrued postpetition on the delinquent real estate taxes owing on the Chevrolet and Ford Dealership Properties; (3) the attorney's fees for the eminent domain action were incurred by, and would be paid by, Debtor's limited partner; (4) termination of the Mazda Dealership franchise was the subject of litigation, but, even it were lost and unable to be sold, this would not affect the Sale Transaction because the Mazda sale proceeds were not earmarked for Debtor's creditors, given that the franchise was owned by a non-debtor and not subject to either the City's or CorePointe's claims; but, in any event, the Mazda Property could still be leased for other purposes to fund the Plan.

The parties agreed to continue the hearing on the Motion to

-10-

Convert to October 25, 2012, to coincide with the scheduled confirmation hearing. However, on October 24, 2012, the parties filed a stipulation to continue both matters to December 5, 2012, explaining that the Sale Transaction was stalled because YTransport had not yet completed its due diligence, and it was still waiting for authorization from the respective auto manufacturers. YTransport had until November 16, 2012, to complete its due diligence, and, if it did not do so, confirmation would not proceed because the Plan relied on consummation of the Sale Transaction. The bankruptcy court entered orders continuing both matters to December 5, 2012.

As the due diligence deadline approached, the parties learned that YTransport would proceed with the Sale Transaction only if the terms were substantially modified. The parties ultimately agreed to extend time until November 29, 2012, for the City to file supplemental papers and/or CorePointe to file a joinder to the Motion to Convert; Debtor had until November 30, 2012, to file a supplemental opposition. The parties needed additional time to negotiate with YTransport and develop potential alternatives, if necessary.

On November 29, 2012, CorePointe filed a joinder to the City's Motion to Convert. According to CorePointe, the Sale Transaction was dead. YTransport was no longer willing to pay the agreed $10 million cash in "goodwill" for the Dealership Franchises and proposed to reduce it to $0, or do a carry-back by Debtor's lenders of a ten-year $10 million subordinated note at 1% interest. YTransport had also proposed a dramatic reduction in the lease rates for the Dealership Properties. Without the

-11-

$10 million up-front cash, the $5.3 million in cash necessary to close the Sale Transaction was not available, and CorePointe would not realize the $5.7 million in sale proceeds to reduce the balance on its loans as provided in the Plan. Without the reduction of CorePointe's principal balances and with the significantly reduced lease rates, the Plan was not feasible. CorePointe asserted that YTransport was not responding to Debtor's counter-proposals or phone calls, so it appeared that YTransport had withdrawn from the Sale Transaction.

In addition, asserted CorePointe, the Mazda Dealership franchise was still terminated, and it now appeared that termination of the Chevrolet Dealership franchise was imminent. According to a stipulation between General Motors and WCM, which was the result of a recent decision by the State of California New Motor Vehicle Board, the Chevrolet Dealership franchise was set to terminate by November 13, 2012, unless WCM submitted a complete buy-sell package for the franchise. GM had sixty days to either approve or reject the proposed buy-sell and transfer of the franchise to the potential buyer. YTransport submitted its proposal to GM on the November 13 deadline. If GM approved it, the sale to YTransport had to close within thirty days. If it rejected it, the franchise terminated voluntarily. If it approved it but the sale did not close within thirty days, the franchise also terminated voluntarily. Thus, with YTransport's withdrawal, CorePointe speculated that either the Sale Transaction would not close within thirty days, or GM would reject the proposed franchise transfer once it learned of YTransport's withdrawal. Either way, the Chevrolet Dealership franchise was all but gone.

-12-

CorePointe further noted that the dealerships were unable to pay September rent based on the September 2012 MOR, which showed total receipts of only $7,200, and that they paid only a partial rent payment for October as reflected in the October 2012 MOR, which showed total receipts of only $46,000. Moreover, Debtor had failed to make its full adequate protection payment to CorePointe for the month of September, instead paying only $36,650, and it had also failed to make the payment for October. As a result, CorePointe began charging interest at the default rate as of November 1, 2012. Finally, CorePointe noted that Debtor had failed to make the November payment of postpetition interest and penalties accruing on the delinquent real estate taxes owing on the Chevrolet and Ford Dealership Properties, and the September 2012 MOR showed a cash balance of only $121.77.

CorePointe argued that "cause" existed under § 1112(b)(4)(A) to convert Debtor's case to chapter 7, because without the Sale Transaction upon which the Plan was based, and with the apparent loss of the Mazda and Chevrolet Dealership franchises, it was unlikely a replacement transaction could be substituted upon which a revised plan could be based. Further, the dealerships appeared unable to make the monthly rent payment of $134,223 needed to fund the Plan. Thus, a reasonable likelihood of rehabilitation seemed absent. To show diminution to the estate, CorePointe argued that Debtor's failure to make the adequate protection payments towards the principal portion of its loans, which accrued interest at the rate of $155,799.13 per month (plus attorney's fees and costs), was consuming the equity in the Properties securing its various loans and further impairing the City's secured portion of its

-13-

claim. Moreover, Debtor's failure to pay the interest and penalties on its delinquent real estate taxes further eroded the estate, as did the estate's unpaid and continuing $2 million-plus administrative claims.

CorePointe argued that conversion was in the best interest of creditors because, based on Debtor's appraisals and the interest shown in the various properties securing its loans, liquidation of those properties would realize sufficient equity to fully pay CorePointe's claim and the administrative claims, and pay a substantial percentage of the general unsecured claims.

The City's second supplemental memorandum in support of its Motion to Convert essentially parroted CorePointe's joinder. The City also noted that YTransport had recently announced that it would not be buying the terminated Mazda Dealership franchise nor leasing the Mazda Property as a result. Ford and Chrysler had also not yet approved YTransport as a replacement dealer. In addition, the City asserted that Debtor's counsel had claimed that Debtor was under no obligation to make any further tax payments or adequate protection payments, that Debtor did not intend to make any more such payments before the December 5 hearing, and that Debtor would never pay the taxes unless the City agreed to postpone the hearing on the Motion to Convert.

The City argued that "cause" existed under § 1112(b)(4)(A) to convert the case to chapter 7 because: (1) Debtor's monthly net operating loss of $80,000 had now accumulated to a loss of more than $1 million; (2) Debtor was $2 million delinquent in real property taxes dating back to the 2008-2009 tax year, had not made (and would not make) the $175,000 tax payment due on November 1,

-14-

2012, and had never paid the monthly interest and penalties accruing on the delinquent real estate taxes for at least nine of its eleven Properties and had now stopped making those payments on the Chevrolet and Ford Dealership Properties in October; (3) the estate was administratively insolvent, unable to pay its over $2 million administrative claims; (4) Debtor had failed to make its October and November 2012 adequate protection payments to CorePointe; and (5) with the complete collapse of Debtor's Plan and the absence of any alternative plan, no reasonable likelihood of rehabilitation existed. The City argued that, based on Debtor's appraisal figures and the City's conservatively estimated value of $4 million for the Mazda Property (which Debtor's liquidation analysis did not include), the sale of Debtor's eleven Properties would realize proceeds of $47,575,000 to satisfy $45,566,424.96 in pending claims against the estate. Therefore, conversion to chapter 7 was in the best interest of creditors.

In its third supplemental opposition to the Motion to Convert, Debtor disputed all of the City's and CorePointe's arguments. Debtor countered that it was solvent, that it had paid all postpetition property taxes that had come due on all of its Properties to date (except the latest $175,000 payment due, which it was prepared to pay by December 10, 2012, if the Motion to Convert was denied), that it had paid the interest and penalties accrued on the delinquent taxes for the Chevrolet and Ford Dealership Properties, and that it had made all adequate protection payments to CorePointe, having missed only one partial payment, which it offered to cure if the case were not converted. In fact, Debtor had offered to enter into a fourth stipulation

-15-

with CorePointe for adequate protection payments for the next several months. As for the alleged operating losses of $80,000 per month, Debtor again contended that this was simply a bookkeeping matter, and any expenses incurred by the accrual of real property taxes were going to be cured with proceeds from the Sale Transaction and/or lease payments made by tenants. Thus, the estate was not suffering any continuing losses or diminution.

As for Debtor's rehabilitation, Debtor asserted that the Sale Transaction was still "very much alive," as GM had just approved YTransport to replace WCM as franchisee of the Chevrolet Dealership franchise. Ford was still considering YTransport's application and had until January 13, 2013, to either approve or reject it. Further, although the parties were still negotiating the sale terms, Debtor asserted that the renegotiation would not result in a reduction of either the purchase price or the rents to be paid under the leases of the Dealership Properties. The fate of the pending sale would be known by December 30, 2012, because YTransport had to close the transaction by that date under the terms of the GM agreement. Therefore, argued Debtor, it was reasonable for the parties to wait that short amount of time to close the sale and confirm the Plan.

Finally, Debtor argued that conversion was not in the best interest of creditors. First, contrary to CorePointe's and the City's contentions, liquidation values for the Properties were far less than their non-liquidation values — $34.68 million as opposed to $48.5 million. Therefore, secured creditors would not be paid in full, and general unsecured claims, which totaled $13.5 million, would have to share a distribution of $1.44 million.

-16-

Further, argued Debtor, CorePointe and the City presented no admissible evidence that buyers were waiting to make offers on the Properties once the case was converted.

Concurrently with its third supplemental opposition, Debtor filed a status report stating that it was not able to move forward with confirmation at the December 5 hearing, and that it wished to continue the confirmation hearing until December 20, 2012. Although YTransport was still willing to pay the same purchase price and lease rates for the dealerships, more time was needed to discuss the terms of the deferred portion of the purchase price.

In its reply to its second supplemental memorandum in support of the Motion to Convert, the City contended that it needed to correct numerous misrepresentations Debtor made in its third supplemental opposition. First, Debtor's assertions that CorePointe and the City had agreed to the modifications proposed by YTransport to the Sale Transaction and modifications to the Plan were false. On the contrary, the City believed that the Sale Transaction had collapsed, and thus the Plan was facially unconfirmable. Second, Debtor's statement that it had paid all of the postpetition property taxes that had come due on all of its Properties to date was also false; Debtor had never paid the interest and penalties accruing on real estate taxes owed on any of the Properties except the Chevrolet and Ford Dealership Properties, which it admittedly stopped paying as well in October 2012.

On December 4, 2012, Debtor filed an emergency motion to approve the fourth stipulation for adequate protection payments to CorePointe for the months of November 2012 through April 2013.

-17-

Besides paying the current balance due and future monthly payments of $106,500.00, Debtor agreed to pay CorePointe $1 million by December 14, 2012, in exchange for CorePointe's agreement to continue the Motion to Convert.[10] In accordance with the parties' agreement, CorePointe concurrently filed its notice of withdrawal of its joinder to the Motion to Convert.

**C. The bankruptcy court's tentative ruling on the Motion to Convert and the December 5, 2012 hearing**

It its lengthy tentative ruling dated December 4, 2012, the bankruptcy court found "cause" to convert Debtor's case to chapter 7 under § 1112(b)(4)(A). The City had demonstrated substantial and continuing loss to the estate based on Debtor's failure to pay the postpetition property taxes of $175,000 due on November 1, 2012. The court further found that absence of a reasonable likelihood of rehabilitation was established because no evidence existed that a deal could be struck with YTransport. YTransport had filed nothing in connection with the Motion to Convert and had not appeared in any prior proceedings. Everything Debtor wanted the court to believe about the continued viability of the Sale Transaction had come only from Debtor. In the court's opinion, this fell short of rebutting the City's substantial evidence that no reasonable likelihood of rehabilitation existed:

> The November 14, 2012 development in which YTransport rejected the terms of the Transaction as originally negotiated and incorporated into the Plan reflects a failure of the parties, after more than a year of negotiations to consummate the Transaction. All parties

---

[10] The $1 million was not coming from the Debtor but from an unknown outside source. It was not considered a loan to Debtor, and no recourse was available against the Debtor. It is not clear on the record whether this money was given to Debtor's estate.

-18-

> agree that the Plan is premised on the successful closing of the Transaction. The Court is not persuaded by Debtor's efforts to argue that a new buyer can be found or, based on the requested changes by YTransport, that new terms to the Transaction can be reached that will allow Debtor to successfully fund the Plan.

Tentative Ruling (Dec. 4, 2012). As a result, the confirmation hearing was taken off calendar.

The hearing on the Motion to Convert proceeded on December 5, 2012. That same morning, counsel for YTransport filed a declaration stating that his client was still actively negotiating the Sale Transaction. At the hearing, Debtor's counsel began by noting that subsequent to the court's tentative ruling, CorePointe had withdrawn its joinder. Counsel admitted Debtor had not made the semi-annual real property tax payment of $175,000 due on November 1, 2012, but argued that the payment was not considered delinquent until December 10, 2012, and that Debtor intended to make the payment by then as part of the fourth stipulation for adequate protection. Counsel further admitted that Debtor had not made the court-ordered payments for the accruing interest and penalties on the delinquent real estate taxes for the Chevrolet and Ford Dealership Properties since October 2012, but said he possessed a check to make the payment for November. Counsel disputed the City's argument that Debtor was not collecting rents from the dealerships; the money collected was being used to pay the adequate protection payments, and any shortcomings for September 2012 were due to some earlier overpayments. Counsel admitted that his firm had an administrative claim of approximately $2 million for fees, but contended that three of Debtor's Properties were unencumbered, and the value of these

-19-

properties far exceeded the amount of the claim.

After hearing further argument from the parties, the bankruptcy court announced its decision to convert the case to chapter 7. Determining that the City had established a prima facie case for "cause," the court found Debtor had not sufficiently rebutted that evidence:

> I think that it really --- at this point, I would have preferred to hear that we will stipulate to a conversion of the case if we don't meet the --- terms of the fourth adequate protection stipulation. I didn't hear that, nor did I hear that there are ongoing negotiations with respect to a deal. There is no deal. There may be potential deals out there in the future, either with YTransport or somebody else that the Court is not aware of, but as we sit here today, there is no deal.
>
> So we're stuck with a motion that was filed some time earlier this year, with continuances after continuances, with no assurance that we have any deal at all. The only thing that we're assured of is that every day the case continues as a Chapter 11. There are administrative expenses. There are other various expenses incurred by the Debtor. And it behooves no one to keep this in a Chapter 11 process . . . .

Hr'g Tr. (Dec. 5, 2012) 45:10-46:1. The court indicated that it would supplement its tentative ruling to make further findings and conclusions as needed, given the information disclosed at the hearing.[11] The court agreed to put a 14-day stay on the order until December 19 so the parties could continue talking, "but otherwise, the case [would] be converted." Id. at 49:16-19.

**D.   Debtor's motion to reconsider, the related order, and the order converting Debtor's case to chapter 7**

Before the bankruptcy court had entered any order converting the case, Debtor moved for reconsideration on December 14, 2012,

---

[11] The bankruptcy court never did supplement its findings and conclusions as intended.

contending that significant events had occurred since the December 5 hearing:

- YTransport had committed to closing the sale of the Chevrolet Dealership franchise by December 31, 2012 (or shortly thereafter) and entering into a long-term lease for the Chevrolet Dealership Property and Hummer Property; however, YTransport was not able to commit to purchasing the Ford or Chrysler Dealerships at this time; and

- $3 million would be escrowed by a third party on behalf of Debtor's estate by December 31, 2012, which would be used to fund Debtor's performance under the fourth stipulation for adequate protection payments, to pay the $175,000 tax payment due and the interest and penalties accrued on the delinquent taxes for the Chevrolet and Ford Dealership Properties, and to pay Debtor's administrative claims.

In the interim, Debtor requested a continuance on entry of the conversion order until January 3, 2013, and sought approval of the leases for the Chevrolet Dealership Property and the Hummer Property so the transaction with YTransport could close by December 31, 2012, as required. Debtor further requested that, and only in the event it provided evidence that the $3 million was fully funded by December 31, the court approve the fourth adequate protection stipulation, set a confirmation hearing on the Plan for a date in January, and continue the Motion to Convert to May 1, 2013, subject to an earlier date if Debtor failed to make a timely payment under the fourth stipulation.

CorePointe and LA County filed declarations in support of Debtor's motion to reconsider. For further support, Debtor offered a declaration from YTransport's counsel, who confirmed his client's intent to consummate the sale of the Chevrolet Dealership franchise and enter into the related property leases. Debtor also offered a declaration from counsel for the $3 million donor. He explained that his client, who chose to remain anonymous, held an

-21-

account at Barclay's Bank containing in excess of $3 million in liquid funds. The $3 million would be deposited in escrow on Debtor's behalf upon notification that the order converting the case to chapter 7 had been vacated or otherwise modified.

The City opposed Debtor's motion to reconsider, contending that Debtor had failed to provide any evidence that YTransport actually entered into a binding commitment to purchase the Chevrolet Dealership franchise and to lease the Chevrolet Dealership Property and Hummer Property; counsel's declaratory statement that his client was "willing" to buy the dealership and lease the properties if a number of things beyond his client's control happened first was not sufficient. Still convinced that Debtor remained insolvent even with a $3 million gift, the City argued that Debtor had failed to provide any information about the "mystery" benefactor or the terms of the escrow. The City contended that Debtor's motion should fail because nothing had changed since December 5: (1) the Sale Transaction had fallen apart, and the proposed transaction did not provide Debtor with enough money to consummate the Plan; and (2) Debtor had failed to pay the $175,000 property tax payment by the deadline, so the estate was continuing to suffer losses.

With no order converting the case yet entered, Debtor filed a reply and a supplemental reply to its motion to reconsider on December 19 and 21, 2012, respectively. Another recent development had occurred that was critical to Debtor confirming its Plan as originally proposed. On December 21, WCM and WCF had entered into two "non-binding" letters of intent with B & B WC, LLC for the sale of the Ford and Chrysler Dealerships under the

-22-

same lease terms, and for the same price, that YTransport had agreed to under the Sale Transaction. Binding agreements would be executed on December 27, 2012, and the sale was to close by March 31, 2013. This left only the Mazda Property unleased, which Debtor asserted could be leased by the beginning of next year. Therefore, once all of the Dealership Properties were leased as contemplated by Debtor's Plan, Debtor asserted that it would have sufficient cash flow to confirm its Plan, which creditors had voted to accept. Attached were copies of the two letters of intent signed by B & B WC, LLC.

In response, the City contended that even assuming the sales to B & B WC, LLC and YTransport were successful, which was unlikely, and assuming Debtor received the $3 million from escrow, insufficient funds would be generated to satisfy the debts of Debtor and its affiliates under the Plan.

Still with no conversion order having been entered, Debtor filed a second supplemental reply to its motion to reconsider on January 1, 2013. The players had changed again. On December 31, 2012, WCM and WCF had entered into a letter of intent with Carlos Hidalgo ("Hidalgo"), a highly qualified buyer whom the City had previously approved, for the sale of all of the Dealership Franchises and lease of all Dealership Properties, including the Mazda Property, under the same lease terms, and for the same price, that YTransport had agreed to under the Sale Transaction. A copy of the letter of intent signed by Hidalgo was attached. Accordingly, Debtor's Plan would be fully funded and was now confirmable. Hidalgo was to be a back-up buyer should YTransport not proceed with the Sale Transaction in whole or in part. Debtor

-23-

also informed the court that WCM had to file a chapter 11 bankruptcy on December 28, 2012, primarily because GM required that the closing of its transaction occur by December 31, 2012, or its franchise would be terminated, and that clearly was not going to happen by the deadline.

On January 2, 2013, the bankruptcy court entered its memorandum decision, its order denying Debtor's motion to reconsider, and its order granting the Motion to Convert ("Conversion Order"). In short, the court found that the "new evidence" presented by Debtor was not sufficient to alter its prior ruling granting the Motion to Convert. Debtor's argument that the $3 million cash infusion would prevent loss was unsupported; Debtor had provided only evidence that the money was ready for transfer, not that the funding was currently available to prevent further postpetition diminution of the estate. Further, the Hidalgo letter of intent was explicitly "non-binding," and, in any event, Hidalgo still had numerous "hoops to jump through in order to even be in a position to follow through on his stated desire to replace YTransport as purchaser." The court concluded:

> The Debtor has a long history of proposing last minute fixes to avoid potential failure of its attempts to reorganize. Each was a mirage. This situation is no different. The additional evidence provided by the Debtor includes letters of intent from B & B to purchase the properties that YTransport does not purchase, but also includes a letter of intent to fully replace YTransport in the Sales Transaction. The Court finds that, in its haphazard and frenetic race to avoid conversion of the case, Debtor has not successfully rebutted the claim that cause exists under § 1112(b)(4)(A). A 'reasonable likelihood of rehabilitation' is no more in prospect now than it was on December 5, 2012 and 'diminution of the estate' continues so long as the anonymous benefactor remains

-24-

a prospective rather than actual benefactor. Memorandum Decision (Jan. 2, 2013) at 4-5.

On January 3, 2013, Debtor filed a declaration from John Egli, consultant to the anonymous benefactor. He confirmed that the $3 million had been wired to the account of Dighton, Debtor's limited partner, and was subject to Dighton's possession and control for Debtor's immediate use. Whether the bankruptcy court ever reviewed this late-filed declaration is unknown. Notably, Debtor submitted no evidence of the escrow's existence or proof that the wire transfer occurred. This timely appealed followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court abuse its discretion in converting Debtor's case to chapter 7?

2. Did the bankruptcy court abuse its discretion in denying the motion to reconsider?

## IV. STANDARDS OF REVIEW

The bankruptcy court's decision to convert a chapter 11 case to chapter 7 is reviewed for an abuse of discretion. Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities), 264 F.3d 803, 806 (9th Cir. 2001); Johnston v. JEM Dev. Co. (In re Johnston), 149 B.R. 158, 160 (9th Cir. BAP 1992). Likewise, the bankruptcy court's denial of a motion for reconsideration is reviewed for an abuse of discretion. Arrow Elec., Inc. v. Justus (In re Kaypro), 218 F.3d 1070, 1073 (9th Cir. 2000); Sewell v. MGF Funding, Inc. (In re Sewell), 345 B.R.

-25-

174, 178 (9th Cir. BAP 2006). A bankruptcy court abuses its discretion if it applied the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011). We can affirm on any basis supported by the record, even where the issue was not expressly considered by the bankruptcy court. O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir. 1989).

## V. DISCUSSION

### A. The bankruptcy court did not abuse its discretion when it converted Debtor's case to chapter 7.

The statutory authority for conversion of a chapter 11 bankruptcy case is found in § 1112(b), which provides that the bankruptcy court shall convert or dismiss a case, whichever is in the best interests of creditors and the estate, for cause. Section 1112(b)(1). The bankruptcy court has wide discretion in determining what constitutes "cause" adequate for conversion under § 1112(b). In re Consol. Pioneer Mortg. Entities, 248 B.R. at 375; In re Johnston, 149 B.R. at 160. The burden of proof is on the moving party. In re Creekside Senior Apartments, L.P., 489 B.R. 51, 60 (6th Cir. BAP 2013); In re Hinesley Family Ltd. P'ship No. 1, 460 B.R. 547, 553 (Bankr. D. Mont. 2011).

### 1. Cause existed for conversion under § 1112(b)(4)(A).

The bankruptcy court found that "cause" existed due to the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. Section 1112(b)(4)(A). As the movant, the City had to establish both (1) a substantial and continuing loss to or diminution of the

-26-

estate and (2) absence of a reasonable likelihood of rehabilitation. In re Bay Area Material Handling, Inc., 76 F.3d 384 (9th Cir. 1996) (unpublished); In re Creekside Senior Apartments, L.P., 489 B.R. at 61. "The loss may be substantial or continuing. It need not be both in order to constitute cause under § 1112(b)(4)(A)." In re Creekside Senior Apartments, L.P., 489 B.R. at 61 (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012)).

### a. A substantial and continuing loss to or diminution of the estate

The substantial or continuing loss prong is demonstrated by a loss that will "materially negatively impact the bankruptcy estate and the interest of creditors," or "dwindling liquidity, or illiquidity resulting in unpaid postpetition debts which usually constitute administrative expenses that will take priority over prepetition claims." 7 COLLIER ON BANKRUPTCY at ¶ 1112.04[6][a][i]. See also In re Schriock Constr., Inc., 167 B.R. 569, 575 (Bankr. D.N.D. 1994)("This element can be satisfied by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the entry of the order for relief."). To determine the existence of a continuing loss to, or diminution of, the estate, the bankruptcy court must look beyond financial statements and fully evaluate the present condition of a debtor's estate. In re Motel Props., Inc., 314 B.R. 889, 894 (Bankr. S.D. Ga. 2004)(citing In re Moore Constr., Inc., 206 B.R. 436, 437-38 (Bankr. N.D. Tex. 1997)).

In the bankruptcy court's December 4 tentative ruling, which it incorporated into its oral findings at the December 5 hearing,

-27-

the court found that a continuing loss to or diminution of the estate existed based on Debtor's failure to make its postpetition property tax payment of $175,000 due on November 1, 2012. It further found at the December 5 hearing that, as long as the Debtor stayed in chapter 11, it continued to accrue administrative and other various expenses.

Debtor contends that the bankruptcy court erred in interpreting "continuing loss to or diminution of the estate" to mean the incurrence of expenses regardless of the debtor's ability to meet those expenses - i.e., that incurring expenses equals a loss to the estate, thereby constituting "cause." Nothing in the court's ruling indicates that it interpreted § 1112(b)(4)(A) as Debtor contends. While the court did comment in its oral ruling that Debtor continued to accrue administrative and other expenses in chapter 11, when viewed in context with its entire ruling, the court was implicitly finding that without the deal with YTransport (or a substitute buyer), Debtor was unable to pay its substantial $2 million (and counting) administrative expenses, which constituted a loss to or diminution of the estate. This finding is made clear by the court's statements in its memorandum on the motion to reconsider that "diminution of the estate" continued as long as the $3 million gift needed to pay these expenses was "prospective" rather than "actual." Although § 1112(b)(4) does not list administrative insolvency as cause to convert a chapter 11 case, a court may still consider this factor. <u>In re BH S & B Holdings, LLC</u>, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010)(citations omitted).

The Debtor alternatively argues that, even if the bankruptcy

-28-

court properly applied § 1112(b)(4)(A), no evidence in the record supports a finding of continuing loss to or diminution of the estate. We disagree. First, as the bankruptcy court found, Debtor had failed to make the $175,000 property tax payment due November 1, 2012. Granted, this may not have been the strongest fact to show loss considering that no penalties would accrue if Debtor made the payment by December 10, 2012, but other facts support the bankruptcy court's decision.[12]

Although Debtor disputes it, the record also reflects that Debtor was not consistently collecting the approximate $135,000 monthly rent from the dealerships. The MORs from June, September and October 2012 show that collections were $180.00, $7,200.00 and $46,000.00, respectively. Further, as of October 2012, Debtor had stopped making the monthly $7,214.26 payment for the interest and penalties accruing on the delinquent real estate taxes for the Chevrolet and Ford Dealership Properties. Debtor also never made any payments for the interest and penalties accruing on the delinquent real estate taxes on its nine other Properties. Further, even if two-thirds of Debtor's continuing monthly operating losses were due to its accrual-based accounting, Debtor admitted that the other one-third was attributed to the accrual of real property taxes, which could only be paid in full with proceeds from the Sale Transaction or tenant rents, neither of which was generating sufficient funds. Finally, although not expressly noted by the bankruptcy court, but supported by the record, it was clear that Debtor was unable to function without

---

[12] At oral argument, Debtor revealed that it did not make the $175,000 tax payment on December 10, 2012.

-29-

the promised, but unfulfilled, $3 million cash infusion. Debtor's inability to pay its obligations without this outside money only establishes further loss.

Consequently, all of these facts established a continuing loss to, or diminution of, the estate, and we see no clear error by the bankruptcy court.

### b. Absence of a reasonable likelihood of rehabilitation

Section 1112(b)(4)(A) also requires the bankruptcy court to find an absence of a reasonable likelihood of rehabilitation. "The issue of rehabilitation for purposes of § 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Wallace, 2010 WL 378351 at *4 (Bankr. D. Idaho Jan. 26, 2010)(quotations and citations omitted). "Rehabilitation is a different and much more demanding standard than reorganization." In re Creekside Senior Apartments, L.P., 489 B.R. at 61 (citing In re Brutsche, 476 B.R. 298, 301 (Bankr. D.N.M. 2012)(citing 7 COLLIER ON BANKRUPTCY at ¶ 1112.04[6][a][ii])).

In its tentative ruling, the bankruptcy court found the absence of a reasonable likelihood of rehabilitation based on a lack of evidence that the Sale Transaction with YTransport, which the parties agreed was the lynchpin to the Plan, would close as planned. Up until then, no representative from YTransport had submitted a declaration or appeared at any hearing establishing that the deal, as set forth in the Plan, would proceed. Although counsel for YTransport attempted to file a declaration on the

-30-

morning of the December 5 hearing, it was filed about fifteen minutes _after_ the hearing had begun. The bankruptcy court articulated these same reservations about the lack of a viable deal in its oral ruling on December 5.

Debtor contends the bankruptcy court erred by interpreting the "absence of a reasonable likelihood of rehabilitation" to mean the "absence of the likelihood of confirmation of the Plan." We disagree that this was the court's interpretation. While the bankruptcy court expressed its concern with Debtor's ability to confirm its Plan, the court was clearly focused on the viability of the Sale Transaction with YTransport — the only potential buyer before it at that time. It concluded that, based on recent developments with YTransport's proposed deal-killing modifications to the Sale Transaction, and no other buyers on the horizon, such bleak business prospects did not justify Debtor continuing with its reorganization effort.

We also reject Debtor's argument that no evidence in the record supports a finding of an absence of a reasonable likelihood of rehabilitation. The evidence before the bankruptcy court on December 5, 2012, was: Debtor had been in chapter 11 for seventeen months; the sale it had been negotiating for the past year, which was its only hope for rehabilitation at that time, had just fallen through; and the estate was experiencing continued losses, including the accrual of substantial professional fees, with no end in sight. Debtor's argument that it had presented the bankruptcy court with contrary evidence of several alternative rehabilitation options and the $3 million "no strings attached" gift escrow lacks merit. These other alternatives and the

-31-

unsubstantiated $3 million gift were not offered until _after_ the bankruptcy court had made its ruling on December 5.  Even when the court did consider this evidence in its decision on the motion to reconsider, it was not persuaded that any of these options were viable - "each was a mirage."  Accordingly, the record supports the bankruptcy court's finding of an absence of a reasonable likelihood of Debtor's rehabilitation.

Debtor's argument that the bankruptcy court erroneously placed the burden of proof on Debtor to establish the "absence of cause" lacks merit.  In its tentative ruling, the bankruptcy court acknowledged that the City had the burden to establish both elements for cause under § 1112(b)(4)(A).  However, it concluded in its tentative ruling and at the December 5 hearing that Debtor had not adequately rebutted the City's prima facie case by showing either that no continuing loss to or diminution of the estate existed, or that rehabilitation was reasonably likely.  See Matter of Woodbrook Assocs., 19 F.3d 312, 317 (7th Cir. 1994)(debtor is obligated to produce evidence in opposition to a well-supported motion under § 1112(b)); In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)(once cause is shown, "it is incumbent upon debtor to show that relief under § 1112(b) is not warranted").  Further, Debtor's argument here rests on the faulty premise that the City submitted "no evidence whatsoever that the Debtor had no reasonable likelihood of rehabilitation."  On this record, we conclude the bankruptcy court properly held the City to its burden.

///

///

-32-

**B. The bankruptcy court did not abuse its discretion when it denied the motion to reconsider.**

A motion under Civil Rule 59(e), made applicable here by Rule 9023, should not be granted absent highly unusual circumstances, unless the court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law. <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 880 (9th Cir. 2009).

Although Debtor appealed the order denying reconsideration of the Conversion Order, Debtor does not articulate in its appeal briefs any specific argument as to why the bankruptcy court abused its discretion in denying it. As a result, this issue has been waived. <u>City of Emeryville v. Robinson</u>, 621 F.3d 1251, 1261 (9th Cir. 2010)(appellate court in this circuit "will not review issues which are not argued specifically and distinctly in a party's opening brief."). Even if we did consider it, we see no error in the bankruptcy court's decision that reconsideration was inappropriate under the grounds set forth above.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

-33-